Charles S. **POLIN** Plaintiff,

v.

**KELLWOOD COMPANY, Kellwood Sportswear, Enoch Harding, Jr., and Harry Holding, Defendants.**

**No. 93 Civ. 7876 (RO).**

United States District Court, S.D. New York.

June 29, 2000.

241

Arthur M. Wisehart, Wisehart & Koch, New York City, for Petitioner.

Steven R. Wall, Morgan, Lewis & Bockius LLP, New York City, for Respondent.

## OPINION AND ORDER

OWEN, District Judge.

Plaintiff Charles S. Polin, the former president of She Knows!!, a division of defendant Kellwood Company, commenced this litigation in this Court in 1993, alleging that he was fraudulently induced by Kellwood to accept employment; that defendants Harding, head of Kellwood Sportswear, and Kellwood Sportswear itself, tortiously and negatively interfered with his employment relationship with Kellwood; and that Kellwood then terminated his employment in an act of wrongful age discrimination. After four years of pre-trial litigation and numerous rancorous discovery disputes,[1] the parties began discussing arbitration as a means to settle the controversy, and on September 27, 1997, Polin's counsel, Arthur Wisehart, wrote to Kellwood's counsel, Steven Wall, giving him the name of Jonathon Liebowitz as an arbitrator. By January 15, 1998, both sides had designated Liebowitz as the neutral arbitrator, and Liebowitz that day wrote both Wisehart and Wall accepting and confirming with them a per diem fee rate for his service of $2000 per day.[2] Two partisan arbitrators had already been chosen: Kenneth Kleinman, by Kellwood, and Martin Freeman, by Polin. Thereaf-

1. *See Polin v. Kellwood Co.*, No. 93 Civ. 7876, 1996 WL 665639 (S.D.N.Y. Nov.13, 1996); *Polin v. Kellwood Co.*, No. 93 Civ. 7876, 1994 WL 673496 (S.D.N.Y. Dec.2, 1994) (involving a minor sanction ($500) against Polin for Kellwood's attorney's fees for wrongfully delaying discovery requiring two motions to compel).

2. Knowing its amount, Wisehart negotiated for Kellwood to pay the neutral arbitrator's fee in its entirety. (Arbitration Agreement ¶ 8(2)). *See infra* pp. 242–43.

ter, on February 25, 1998, the parties in a by-then written Arbitration Agreement confirmed that it was in their "mutual best interest to submit to final and binding arbitration all the claims brought by Polin."[3] The agreement specified that the arbitration was to be "subject to the National Rules for the Resolution of Employment Disputes of the American Arbitration Association, . . . and the terms and conditions of this Agreement."[4] It provided that in the event of a conflict between the AAA rules and the arbitration agreement, the agreement would control, and that on review of any arbitration award the Federal Arbitration Act, 9 U.S.C. §§ 10 and 11, should apply. The agreement further provided 1) that "the arbitration panel shall have the authority to provide whatever remedies are currently available under law for the claims asserted by Polin in the action captioned *Polin v. Kellwood Company et al.*, Civil Action No. 93–7876(RO), as part of its final and binding arbitration award[s]," 2) that (the AAA rules applying) the "arbitrator may grant any remedy or relief that the arbitrator deems just and equitable, including any remedy or relief that would have been available to the parties had the matter been heard in court. The arbitrator shall, in the award, assess arbitration [f]ees, expenses, and compensation as provided in Section 36, 37, and 38 in favor of any party[,]" 3) that "[t]he arbitrator shall have the authority to provide for the reimbursement of representative's fees, in whole or in part, as part of the remedy, in accordance with applicable law," and 4) that under AAA rules "All expenses of the arbitration . . . shall be borne equally by the parties, *unless they agree otherwise or unless the arbitrator directs otherwise in the award.*" (emphasis added). Here, Polin and Kellwood *did* agree "otherwise", to wit, that Polin would

pay for Martin Freeman, the arbitrator selected by him, and Kellwood would pay not only the administrative costs of the arbitration and the full costs of the arbitrator it selected, Kleinman, but also the full costs of the neutral arbitrator, Liebowitz, that Wisehart had proposed. Also, here, "the arbitrator[s][did] direct[ ] otherwise in the award." *See infra* pp. 246–50. Further, they agreed "that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction," which included this Court. This action in this Court was then placed on the suspense calender.

The arbitration proceedings were held in New York City and began with opening statements on April 1, 1998, and continued April 2 and 3, Wisehart presenting evidence on behalf of Polin. The proceedings were then adjourned to June 1. On May 22, however, apparently in response to Kellwood's opening statement that She Knows!! lost eight million dollars, Polin, by subpoena to Kellwood, demanded the production of a large volume of financial documents. Kellwood moved to quash the subpoena contending that it was not permitted by the arbitration agreement which precluded any further discovery under the circumstances, that Polin had already been provided with over 5000 pages of financial records, and that compliance with Polin's new demand "would take weeks, if not months, to gather such documents, and a tractor-trailer to deliver such documents." Later on the day that Kellwood submitted its motion, Wisehart, wishing to have a hearing and ruling on the motion, telephoned neutral arbitrator Liebowitz and Steven Wall, Kellwood's attorney. Unknown to them, Wisehart had a reporter at his end taking the conversation down. Liebowitz refused to rule on the motion because he had not read the papers and

---

3. By stipulation, the parties agreed to the dismissal of any claims against defendants Enoch Holding, Jr., Harry Harding and Kellwood Sportswear and that Kellwood assumed the liability of these dismissed defendants. (Stipulation, dated Mar. 10, 1998).

4. Other than the parties incorporating the AAA rules into the agreement, the AAA itself was in no way involved in the arbitration.

asserted that two arbitrators were necessary to make a ruling. While still on the phone, however, Liebowitz complained that

5. The transcript, not disputed as to accuracy, turns out to be of assistance to the Court on issues that later developed. *See infra* pp. 244, 246, 256–59, 263–64. It reads:

MR. LIEBOWITZ: ...

Housekeeping item number 3.

I have not been paid and I am very unhappy about it, contrary to my understanding as to the fee. It is contrary to sound business practices and our contract, as far as I am concerned.

I brought it up a number of times to Steve [Wall]. I spoke to his assistant a couple of days ago, and she said she would check into it and let me know.

I have been told that ten days is the usual time and the sound business practice is 30. If you have some other arrangements that you would intend to make, I would like to know about it, and I would like it to be taken care of. To me this contrary to what my understanding was and is.

MR. LIEBOWITZ: I have to bring it up to both of you because it involves the case, and Arthur is not directly involved in the issues.

MR. WALL: In response to your call to my assistant, I called the general counsel of Kellwood, and inquired as to where the bill was, and he had it on his desk and he said he was immediately going to process it. That's what I know of today. .

MR. LIEBOWITZ: All right. That bill is dated April 6, and if this is the procedure that we are going to be going through, I would like to know what kind of time frame will we have in the future, when I can expect payment. Then I will be able to evaluate my position. *Did you say something Steve?* Steve, Arthur, Steve.

MR. WISEHART: I am right here, waiting to hear what's said.

MR. LIEBOWITZ: I don't know. Steve. Maybe he said hold on.

MR. WALL: Hello. Hi. I do not, I have no further information at my fingertips other than what I just communicated. I will follow-up on it and be able to tell you more. But as of right now what I know is what was communicated.

MR. WISEHART: I don't think that responded to the request as to future intent.

MR. LIEBOWITZ: If this is the procedure whereby it sits around on people's desks as a couple of months go by, at least, then I would like to know that. That was not my impression.

This is a big company, as far as I know, am I involved here in subsidizing people for

his April 6 invoice had not been paid by Kellwood (the party) as Wisehart and Wall had agreed.[5] He specifically reminded

a month or two months on bills, and if so, I would like to know that.

WALL: I don't know what you want me to tell you. I am not paying the bill. .

Do you want me to write a check?

I am not going to write a check.

I am telling you what I learned from my client, and that is all I can tell you.

MR. LIEBOWITZ: Okay.

MR. WALL: I told you that I will look into it more, and I will. And I will inform you what I find out. But that is the best I can do.

MR. WISEHART: I think you could tell him what your recommendation would be.

MR. WALL: I don't think that you have any business in this whatsoever, Mr. Wisehart, unless you are prepared to contribute to this. We made arrangements that were fully known to you, that Kellwood was paid, would pay the full expenses of the neutral arbitrator and we are committed to that and that will happen. And I don't know what glitch occurred which caused this delay in payment.

It is a rather unusual situation, in that I am assuming that that's what caused the glitch. And I will follow-up with it as promptly as I can to see when you are going to get paid. It is not our intent to delay payment or not pay.

It was, as I agreed with you, I thought it was reasonable, given the spread of time of the hearing that you bill us at the conclusion of each set of hearings and which you did and that is still my present intent.

And I would certainly hope that your bill for the next stage, which I assume would come to us at the end of next week, is going to processed very promptly.

MR. LIEBOWITZ: All right. You are telling me that you will do what you can to move through any glitch that there is, that is good enough.

MR. WALL: If it makes any difference, Mr. Kleinman hasn't been paid either, and I am having the same conversation with him. I am trying to find out what the problem is.

MR. LIEBOWITZ: All right. I don't want to belabor this, this is embarrassing to me. The neutral chair of a panel should not have to make these calls.

Maybe if somebody misplaces a bill or something, you have to kind of remind them.

I don't relish this at all. But I will tell you that there is a procedure and I have applied it in other cases, where this kind of thing happens and inured, and that is to suspend the proceeding until the bill is

.. 

Wisehart and Wall in apologetic terms that he had the authority under the AAA rules to suspend the proceeding until he was paid, though he did not wish to do that. At the end of the conversation, somehow Liebowitz sensed that Wisehart was recording it,[6] and upon being told that it was so, Liebowitz informed Wisehart that the recording was unauthorized and would be rejected if offered as part of the arbitration record. The transcript, as it turns out, however, is instructive here. Sometime later, the panel granted Kellwood's motion to quash.

In any event, in order to avoid Liebowitz effecting a delay of the proceedings, which Wisehart had specifically stated he did not want since it would cause him "substantial injury", *see supra* note 5, on June 1, Kellwood's law firm forthwith paid Liebowitz' April 6 invoice, aware some "glitch" had delayed Kellwood Company processing the invoice. Wisehart continued Polin's direct case that day and the next, at which time the proceedings were adjourned to August 5. Liebowitz then submitted another bill to Kellwood on June 10, and again, in order to avoid delay, Kellwood's law firm paid that bill on June 24.

The proceedings resumed on August 5 with Wisehart continuing Polin's direct case for three days through August 7, at which time Wisehart rested Polin's direct case. The record then reads:

> ARBITRATOR LIEBOWITZ: Plaintiff rests.
>
> Mr. Wisehart, have you presented all witnesses and documentary evidence, who or that, in your professional judgment, should have been presented on behalf of your client, Mr. Polin, on your direct case?
>
> MR. WISEHART: Yes, subject to my specific—— subject to certain exceptions I've noted as to evidence that was not made available.
>
> ARBITRATOR LIEBOWITZ: I don't understand that answer. What evidence?
>
> MR. WISEHART: The rulings that we couldn't produce.
>
> ARBITRATOR LIEBOWITZ: Except for rulings of the panel, the other side

(Tr. of May 28, 1998, at 16–22).

6. Liebowitz' surprise is apparent:

> MR. WISEHART: The issue is a more substantive issue.
> MR. LIEBOWITZ: Is anybody making a recording?
> They shouldn't be.
> It is totally unauthorized. I will tell you that I am going to bar it.
> I should have—— I am starting to get a real bad feeling about this whole proceeding.
> I have bent over backwards to make time available to you both and now you are making a recording without my permission; it is not a hearing.
> MR. WISEHART: I said at the beginning, the letter we sent that you did not receive said that we anticipated that there might be ruling at the conference, so I apologize.
> MR. LIEBOWITZ: Who gave you authority to record it? Is this going to be part of the record, offered as part of the record of this hearing? If it is, I will reject it.
> (*Id.* at 23–24).

---

paid. And if the next one is similarly, for some reason is subjected to the glitch, the same thing happens, so it does concern Arthur, because if that is the procedure and I decide to invoke, he would not have any other proceedings until the bill is paid.
MR. WISEHART: And that would cause us substantial injury to have that kind of delay.
MR. LIEBOWITZ: I don't want to do it. There is a procedure in place, and I don't believe that person in my position should be coming around saying hey about paying my bill, it is not the position to put an arbitrator in.
I can't speak for Ken Kleinman. But I find this very distasteful to have to get into this. I am also not going to proceed and subsidize for a multi-million dollar corporation. If there is a problem, I expect to know about it. If there is a time frame that has to be arranged and I expect to know about it, fine. I guess enough has been said, and I would depend on you Steve to get this straightened out. Okay.
MR. WALL: Yep.
MR. LIEBOWITZ: I am sorry that it had to come up at all, but I may as well be up front with it. . . .

was heard and we made rulings. Your answer is yes?

MR. WISEHART: Except for those rulings that we took exception to.

ARBITRATOR LIEBOWITZ: There's always exceptions to rulings and to adverse rulings. Other than that, you've put your case in and had your chance; right? That's all we want to know.

MR. WISEHART: Right.

(Tr. of Aug. 7, 1998 at 1364–65).

Thereupon, Wall stated he was going to move to dismiss all the claims, asserting insufficient evidence to sustain them. Wisehart immediately complained that he was being treated unfairly because he was going to call two more witnesses, Sherri Polivka and Paul Celona but couldn't. The panel reminded Wisehart that he could have called Celona as part of his direct case had he chosen to, but to give Wisehart every opportunity to present Polin's case, the panel scheduled a telephone conference for August 14, a week later, so Wisehart could present an offer of proof as to Celona and Polivka, Polin's alleged successor at She Knows!!.

At that telephone conference, (as the panel later recited in its opinion of April 10, 1999, at 35), Wisehart represented that Celona would testify that Enoch Harding, president of Kellwood Sportswear, located in Rutherford, refused to or incorrectly supplied pants, samples, or patterns. Wisehart also represented that Celona would testify that Kellwood Sportswear did not understand the juniors market which She Knows!! was in and was unwilling to understand that market. He represented Celona would testify that Harry Holding, Kellwood's vice president of marketing, accused Harding of "sabotaging" She Knows!!, and that Tim November, a Kellwood Sportswear scheduler, told Celona he could not ship available goods to She Knows!! because Harding had prohibited him and he was fearful of Harding. The panel, accepting Wisehart's representations, agreed to hear Celona, but it rejected the offer of proof as to Polivka.

With this before it, on October 14, 1998, the panel granted Kellwood's motion for judgment on the fraudulent inducement and age discrimination claims (arbitrator Freeman dissenting) but, based essentially on Wisehart's offer of proof as to Celona, the panel denied the motion to dismiss Polin's claim that Harding and Kellwood Sportswear tortiously interfered with Polin's employment relation with defendant Kellwood Company and required Kellwood to go forward with its proof on this issue.

But before this could happen, the panel and the parties participated in a subsequent telephonic conference because Wisehart requested the arbitrators sign subpoenas for four witnesses for Polin's rebuttal case, Mr. Joseph, Sherri Polivka, Gary Jastrow, and D.L. Thompson. The panel, concerned that the testimony would be repetitious of Polin's direct case and perhaps not relevant to any issue yet to be raised by Kellwood's defense, decided to allow Kellwood to put on its case before signing the subpoenas.[7]

7. Excerpts from the transcript of the October 21, 1998, telephonic conference reveal the panel's expressed concerns:

ARBITRATOR LIEBOWITZ: [addressing Wisehart] Haven't we been through this before ... This is all argument and testimony that is in the record.... I'm not going to go through this whole record over and over again. That's your direct case. It's in.... I just don't have the time to re-litigate this whole case, with all due respect.... As far as I'm concerned, we're on Kellwood's rebuttal case.... You don't even know what the heck it [Kellwood's rebuttal case] is, and you're already subpoenaing witnesses. Which from your own statement sounds like, to me, is to repeat your direct case, and you can't do that.... You're trying to load this record.... [Y]ou're running up a tremendous bill for Kellwood and not doing anything. All of this stuff is in the record, your exhibits that your referring to, all of your testimony about what these guys supposedly did.

(Tr. of Oct. 21, 1998, at 33–35).

Two days after the panel declined to sign these subpoenas and three days before Kellwood was to put on its defense, Wisehart, on October 23, a Friday, wrote and delivered a letter to the American Arbitration Association making a number of factual allegations, viz.: that some three months earlier, on August 7, 1998, in an off-the-record discussion, Liebowitz "stated that if counsel for Polin states that he has not received a fair hearing, he [Liebowitz] will abandon the case and will decline to decide the dispute to be arbitrated," (Letter from Wisehart to the AAA of Oct. 23, 1998, at 2–3), that "the defendants have been making payments directly to the neutral arbitrator [Liebowitz], by-passing the American Arbitration Association, a procedure that is objectionable," [8] (*id.* at 4), and that "the neutral arbitrator's ruling on this [refusal to require Kellwood to provide daily transcripts] and other procedural matters is believed to be influenced by Kellwood's ability to withhold or delay payments to the neutral arbitrator if Kellwood disagrees with his rulings," (*id.* at 5). Wisehart closed his letter by asserting:

22. However, it is clear that *defendants would withhold any further payments to the neutral arbitrator as a means of coercing him into desisting from granting such additional time necessary to complete the arbitration.*[9]

23. Such a tactic is contrary to the National Rules and the Due Process Protocol, under which it provided that the arbitrator may postpone hearings for good cause shown as provided in paragraph 17, and the further provision that *if there is a vacancy, the American Arbitration Association may fill the vacancy* in accordance with the applicable

provision of the National Rules so that the award can be rendered, as provided in paragraph 13.

(*Id.* at 6) (emphasis added). One notes, again, that the AAA, the recipient of this letter, had not at any time played any part or role in this case except for the incorporation of its rules in the parties agreement.

Kellwood and the arbitrators were not furnished copies of Wisehart's AAA letter until the next day, Saturday, October 24. The hearings went forward the following Monday starting with Kellwood's defense to the surviving tortious interference claim, as well as Polin's rebuttal case and Kellwood's surrebuttal case, running for two and a half more days, Celona being the last witness closing the proof-taking on Wednesday morning, October 28. But before the hearings had resumed the prior Monday, October 26, Wisehart was told by the panel he would be given an opportunity after the close of proof to tell them the basis for his letter to the AAA.

Wisehart was given the promised opportunity Wednesday afternoon, October 28. However, as an accommodation to Wisehart, the panel agreed to postpone the hearing until the following day to allow Wisehart's attorney time to prepare. *See infra* pp. 259–61 and note 40. Since Wisehart's letter attacked Liebowitz' reputation, the panel decided to have arbitrator Kleinman preside over the said hearing. The next day, arbitrator Kleinman stated the panel's purpose:

ARBITRATOR KLEINMAN: The purpose here is this letter of October 23, 1998, [Wisehart's AAA letter] among other things, constituted a direct at-

---

8. But see *supra* note 2 and the Arbitration Agreement itself at pages 2–3, where this very payment method had been negotiated by Wisehart. The panel found: "The only reason Panel Chair Liebowitz was paid by Kellwood, rather than by both Polin and Kellwood, is that Wisehart insisted on such an arrangement as a condition to agree to arbitration (Agreement ¶ 8.2)." (Arbitrators' Opinion of Apr. 10, 1999, at 45).

9. Footnote by the Court: This claim of "withholding" payments to coerce the arbitrator is the opposite to Wisehart's present contention before this Court that Kellwood's counsel should be censured for *advancing* two payments to Liebowitz to avoid the delay that Wisehart wanted to avoid, *see supra* note 5, and that this advancement constitutes grounds for vacating the award.

tack on the integrity of the Panel and specifically Arbitrator Liebowitz, a direct attack. And that attack is based upon beliefs, according to the letter. We don't know where those beliefs came from, because it's certainly not in the record as far as an attack, why his integrity, why there should be a challenge to the fact that Arbitrator Liebowitz would rule a certain way on procedural or substantive issues because of an alleged concern that he wouldn't get paid.

That is as serious an accusation that can be made against an Arbitrator or a judge, for that matter. It can't be any more serious than that. That is Mr. Liebowitz's livelihood, which is in part controlled by the American Arbitration Association. These are extremely serious allegations Mr. Wisehart has leveled against him.

It is our intent to ask him[10] why he leveled those accusations and the basis for those accusations, because we don't know what the basis of that is. To us, upon reviewing the record, we don't believe there is a basis for that.

I propose to proceed to ask him [Wisehart] questions. If he decides to refuse to answer questions, then we'll put that on the record and there is nothing else we can do. We can't force him to open his mouth. That's up to you and Mr. Wisehart.

(Tr. of Oct. 29, 1998, at 35–37). Refusing to support his any of his allegations, Wisehart stated he would not answer any questions, "On constitutional grounds as well as jurisdictional grounds." (*Id.* at 62).

Some three months later, on February 8, 1999, the panel issued a brief ruling on the merits in which it found in favor of Kellwood on the remaining tortious interference claim which had survived only because of Wisehart's unfulfilled representations as to Celona's prospective testimony, whom the panel had by then heard and as to whom they later wrote: "Celona's testimony, then, presented the opposite picture than had been discussed by Wisehart.... Wisehart's false representations in this regard misled the panel ..." (Arbitrators' Opinion of Apr. 10, 1999, at 37). *See infra* pp. 248–50. The panel unanimously sanctioned Wisehart for his misconduct and contempt of the panel and awarded Kellwood one-half of the arbitration costs to be paid by *Wisehart* personally. By cover letter attached to this ruling, the panel indicated that an full written opinion would be issued on or *before* April 12, 1999. In response to this ruling, Polin, on February 25, 1999, filed a petition to vacate the award, for a stay and for other relief.

On April 10, 1999, the panel issued an extensive, detailed forty-six page opinion signed by all three arbitrators, and a six page dissent by Freeman solely on the fraudulent inducement issue. Unlike the October 14, 1998 ruling on Kellwood's motion for judgment in which Freeman dissented both to the dismissal of the age discrimination claim and the fraud in the inducement claim, Freeman in this final opinion dissented only to the dismissal of the fraud in the inducement claim, agreeing with his colleagues to dismiss the age discrimination claim. The April 10 opinion details the panel's reasoning for it unanimously dismissing the age discrimination and tortious inference claims, and unanimously sanctioning Wisehart while finding 2–1 in favor of Kellwood on the fraudulent inducement claim.

As to the panel's determinations on the merits, while dealing with the law hereafter and innumerable collateral issues, I observe at the outset that there is no legal or factual basis whatever to put the panel's findings or conclusions in any question were there not a plethora of alleged collateral issues raised by Polin and Wisehart, and it is as to those that the vast bulk of

---

**10.** Footnote by the Court: Arbitrator Kleinman was at that point addressing attorney Martin Seham whom Wisehart brought in to represent him individually.

this opinion hereafter is required to address.

Thus, as to the age discrimination claim, the panel found, "There was no evidence to support it", (*id.* at 25); that it was "frivolous", (*id.*); not "even a colorable claim", (*id.* at 25–26), because Polin presented no evidence to support his claim *other* than he was within the protected age group when hired.[11] The panel found that:

> [a]side from Polin's beliefs that Sherri Polivka of Kellwood is 'youthful looking,' [that] Polin should have remained at Kellwood, and that he rather than Polivka should have headed up a continued She Knows!! operation, a claim which conflicts with the evidence of Polin's own part in bringing about the demise of She Knows!!, partly contained in the testimony of Polivka[12] herself, there is simply no ground for a claim of age discrimination.

(*Id.* at 26).

During the arbitration, Polin had proceeded on a theory of disparate treatment age discrimination. Polin presented no evidence that he was qualified for the position or "that Kellwood's failure to retain him was motivated by age discrimination." The panel found that Polin, though an expert salesman, took on responsibilities as president of She Knows!! which were beyond his capabilities. Additionally, the panel found that Polin's supposed replacement, Polivka, was forty years old and within the same protected age group and that individuals other than Polin had been terminated or retired from Kellwood after their divisions lost money.

As to Polin's tortious interference claim, which was based on his assertion that Harding had intentionally undermined or "sab-otaged" Polin's division, this essentially was to come from the testimony of Paul Celona that Wisehart had earlier told the panel would so testify—but—Celona, when before them did not, *see infra* pp. 248–50, and the panel therefore found this claim "not proved."

With regard to the sanctioning of Wisehart personally for misconduct, the panel based its authority to make this determination and so act on the agreement, the AAA rules, and the applicable law. The panel cited the agreement which incorporates the AAA rules including rule 32(c) and (d), authorizing, respectively, any remedy available had the matter been heard in court and attorney's fees as a remedy in accordance with applicable law. The panel then observed that since federal courts "have equitable power to award sanctions when counsel has 'acted in bad faith, vexatiously, wantonly or for oppressive reasons,' *First National Supermarkets, Inc. v. Retail, Wholesale and Chain Store Food Employees Union Local 338*, 118 F.3d 892, 898 (2d Cir.1997)," and since Rule 11 of the Federal Rules of Civil Procedure provides authority to sanction parties or attorneys for filling and continuing a frivolous claim, so, too, does the panel because it had been given the authority under AAA rule 32(c) to fashion any remedy a court would have the power to fashion. Moreover, the New York City Human Rights Law permits an award of attorney's fees and costs to the prevailing party in an age discrimination claim,[13] and the panel also based its award on that as well. (Arbitrators' Opinion of Apr. 10, 1999, at 31–33).

As to the factual basis for the sanctioning of Wisehart, the panel found that Wisehart had made "false representations" with regard to what Paul Celona would

---

11. The panel in its unanimous opinion on this subject deduced that the claim was asserted "to justify a claim for counsel fees pursuant to the New York City Human Rights Law", (Arbitrators' Opinion of Apr. 10, 1999, at 26), which is what Wisehart demanded in his complaint. (Compl. ¶¶ 58, 62). Wisehart now before me erroneously claims this action was brought under the Age Discrimination in Employment Act which he asserts does not provide for fees to prevailing employers.

12. Footnote by the Court: Polivka had by this time testified and been subject to Wisehart's cross examination.

13. *See supra* note 11.

testify to. (*Id.* at 34). They found that Celona's testimony[14] was "at significant variance from Wisehart's representations." (*Id.* at 36). They stated:

> Celona's testimony, then, presented the opposite picture than had been described by Wisehart. Rather than intentional sabotage and refusals to assist, there were substantial efforts by Rutherford to work with She Knows!! and difficult management decisions to allocate resources. Rather than showing the destruction of She Knows!! by the actions of Harding, Celona testified that She Knows!! sowed its own seeds of destruction, by changing the business plan to seek earlier deliveries of far more extensive lines. Had Celona's testimony been represented accurately by Wisehart, there would have been substantial possibility that the tortious interference claim might have been dismissed, thus obviating the need for three additional days of hearing. Wisehart's false representations in this regard misled the Panel, were a serious breach of professional responsibility, and may well have led to significant increased expense to Kellwood.

(*Id.* at 37).

It appears that Wisehart misrepresented the testimony not only of Celona but also of Polivka. However, that misrepresentation had no impact on any panel decision because the panel had rejected that offer of proof. In its opinion, the panel also found that Wisehart 1) falsely accused Kellwood and its counsel of interfering with witnesses testimony, of maintaining false financial documents, and of destroying evidence; 2) improperly transcribed a telephone conference with Liebowitz and Kellwood's counsel without telling either party; 3) unduly prolonged the hearings by a constant repetition of questions, a reiteration of the same areas of inquiry, and by continuously interposing spurious objections; 4) pursued a frivolous age discrimination claim; and 5) committed a contempt of the panel by sending a letter to the AAA before the proceedings had terminated containing false and unsubstantiated statements about arbitrator Liebowitz, which it considered to be a serious breach of professional ethics. (*Id.* at 34–46). For all of the reasons listed, the panel sanctioned Wisehart in the amount of one-half Kellwood's arbitration fees and expenses, excluding witness fees, which one-half totaled $153,237.64. Accordingly, the panel's determination on the merits, all having ample support in the record, may not be rejected.

---

14. While the panel summarized Celona's testimony, I note that the panel in this crucial fact-specific area (and from the Court's own reading of the record) was scrupulous in its attention to and specific citing of transcript references:

> First, Celona testified that he had no personal conversation with November, but was part of a sales group conference call, at which November simply stated that Harding determines which customer gets shipped deliveries (Tr.1992). Celona did not testify as to any of the statements that Wisehart had represented November allegedly told Celona. Second, Celona testified that Holding did not believe that Harding was giving She Knows!! adequate support or attention (Tr.1984), but he made no mention of intentional "sabotage." Third, far from testifying that Rutherford gave no assistance and support, Celona testified at length that he worked with Rutherford to work out fit problems (Tr.1971) and sample problems (Tr.1975), and that She Knows!! was permitted, with Harding's endorsement, to hire pattern maker, Ed Jenkins, to speed the process and provide better customer response (Tr.1976, 2012). He also testified that it was She Knows!!'s decision to sell a far more extensive line than simply the loafer pant, which was beyond Rutherford's ability, was not consistent with the original business plan outlined in July, 1991, and which required import sourcing (Tr.1977, 2006–2007). It was also She Knows!!'s decision to try to produce a line for late fall, 1991, which led to production problems (Tr.2006). Finally, and significantly, Celona testified that Harding's decisions to ship one customer rather than another was simply a "senior management decision" to obtain the best "impact" of the available resources (Tr.2022).

(Arbitrators' Opinion of Apr. 10, 1999, at 36–37).

Thereafter, following the April 10 panel opinion, on May 10, 1999, I ordered the postponement of any further proceedings on the motion to vacate "until after the Arbitration Panel issues its decision regarding the fees and costs awarded to Kellwood." Thereafter, the arbitration panel issued three unanimous rulings, two on June 23, and one on October 20. The panel in its June 23 rulings, which were based on an affidavit from one of Kellwood's attorneys, determined Kellwood's fees and expenses and directed Wisehart to pay half of Kellwood's fees and expenses to that point, that one half being $145,-452.68. The panel also granted Kellwood leave to submit additional documentation supporting a further award for final costs upon receipt of all the final billing statements from the two arbitrators and gave Polin fifteen days thereafter to respond. After such submissions, the panel said it would "render a Second Supplemental Award finally determining the issues of amount of costs of this arbitration as defined in its Award of February 8, 1999, in addition to the costs awarded herein." (Arbitrators' Award of June 23, 1999, ¶ 3).

In response to the panel's June 23 decision, Polin submitted motion papers on August 11 for leave to supplement and amend the petition dated February 25. To these papers were appended copies of two internal memoranda which Polin's arbitrator Freeman had sent to the other arbitrators dated June 5, 1999, and July 3, 1999, and as to which Wisehart and his paralegal Joan Lipin had made numerous phone calls to Freemen ultimately persuading him to send them.[15] While Freeman had used the word "dissent" in captioning these internal memoranda, they were not dissents in the legal sense, nor did Freeman so intend them. *See infra* note 16. Wisehart, nevertheless, in submitting these to the Court characterized these statements as Freeman's "dissents" and proceeded to make numerous arguments to vacate the award based on these memo-

randa. As observed earlier, *see supra* pp. 244–48, Freeman *had* actually "dissented" to the panel's October 14, 1998 brief ruling, on the dismissal of Polin's age discrimination claim and fraudulent inducement claim, and *had* dissented to the panel's April 10, 1999 opinion, but this time only on the fraudulent inducement issue, concurring on all the rest. But Wisehart, now having submitted these two internal memoranda as *additional* "dissents", argued that these *"four* dissents" were sufficient to vacate the award because they allegedly exposed extensive and improper *ex parte* conversations between Kleinman, Kellwood's chosen arbitrator, and Wall, Kellwood's counsel. However, only the June 5 and July 3 "memoranda/dissents" refer to *ex parte* conversations. Both were written before Freeman signed the two supplemental panel rulings dated June 23, 1999. By not attaching these to the supplemental rulings, Freeman obviously regarded them as having no effect as to any part of the award.

Thereupon, responding to Wisehart's said representation to the Court as to these statements being Freeman's "dissents", Kellwood put before me Freeman's subsequently written highly apologetic memorandum, dated August 19, 1999, in which Freeman noted that a lot of things had been "clarified" since the June 5 and July 3 statements, i.e., "dissents", and explained that he never intended the June 5 and July 3 statements to be "dissents," that those statements were "an internal matter between the arbitrators," and that he had told Joan Lipin, Wisehart's paralegal, they could not use the statements. *See infra* note 16. Freeman also explained that the telephone conversations, as to which he had complained to his colleagues in those earlier statements, had been explained by Kleinman to his "complete satisfaction," and given that, on July 16, 1999, he signed the June 23 panel ruling *without dissent.*[16]

---

**15.** *See infra* note 16 for Freeman's memorandum detailing this.

Because Wisehart knew that Freeman had repudiated the supposed "dissents,"

16. Wisehart's motion to strike this apology of his own arbitrator (not disputing Freeman's authorship nor signature) on the ground it was not sworn fails because Kellwood offered it to rebut Wisehart's putting before me and quoting to the Court from the two earlier Freeman internal memoranda, they being equally unsworn. Wisehart's further attack on the statement as "manufactured" is based on Lipin's September 23, 1999 affidavit, ¶¶ 27, 30–36, 38–40, 42–44, where she recites numerous calls by her to Freeman and his wife, but there, even she, aside from innumerable conclusory phrases, does no more than indeed support the first of two basic points of Freeman's August 19 statement, (the entirety of which is set forth hereafter) which is that there was a time when 1) there were many calls between the arbitrators (which they were entitled to have and should have if they felt it necessary), and 2) that Freeman was "furious" over what he thought was "improper action between Kleinman and Wall" arising from certain billings [A]. But Lipin's affidavit neither disputes nor even addresses the second and crucial fact in Freeman's statement that *thereafter* Kleinman explained everything to his "complete satisfaction" and that Freeman in substance had so advised told Lipin and Wisehart and had signed the award accordingly.[B]

[A] As a footnote to the footnote: Kleinman was the arbitrator appointed by Kellwood, and the arbitration agreement provided that Kellwood was to pay Kleinman's bills, and, of course, Wisehart saw nothing wrong with talking *ex parte* to his own arbitrator Freeman, *see infra* note 37.

[B] As a footnote to the footnote: In Lipin's affidavit in ¶¶ 38–9, Lipin *is talking about a "dissent" that was not a "dissent"* (see the text, below).

August 19, 1999

A STATEMENT: re WISEHART SUBMISSION OF LAW

It is incumbent upon me to clarify a few things relative to quotes attributed to me in Mr. Wisehart's submission. First and foremost he had no right to do this and he knew that. He knew full well that this was an internal matter between the arbitrators and was never intended as another dissent on "fraud in the inducement." Mr. Wisehart had been in toucn [sic] with me on a couple of occasions expressing concern about the award. I did not discuss that with him other than to listen to him state that it could ruin him. In the meantime I continued to reread everything as I had done in the instance of Mr. Kleinman's footnote reference to my dissent on fraud in the inducement in the final opinion. In my reading of everything I came across some billings sent by Ms. Angeline in February that gave me some concerns. When I received additional billings from her in May I became furious. I discussed it with Mr. Liebowitz and subsequently sent him a scathing report relative to what I believed were improper action between Mr. Kleinman and Mr. Wall. Mr. Liebowitz forwarded my report to Mr. Kleinman who in seeing it understood the way it appeared to me. In a rather long call he explained to me the details of the six instances that I cited to my complete satisfaction. At the conclusion he asked if I would be willing to sign off on the award, and I said send it. I signed it, had it notarized and sent it in. In a call from Mr. Wisehart he asked if I had anything I[sic] that could help. This was prior to my call from Mr. Kleinman. He asked me to send it to him. I did not. The following week I had a call from Joan Lipton [sic] saying that they hadn't received anything. This was one of several calls from her. I told her there was nothing they could use from it. I mailed it. Somewhere in the next few days they received their copy of the award with my signature on it. That brought two calls from Mr. Wisehart urging me to an affidavit including the three documents I had done. The reason was according to him that by my signing the award I had negated my dissent on the fraud in the inducement. I said I wouldn't. Over the next week I had three or four more calls from Joan making the same point on behalf of Mr. Wisehart. I told her the only one that mattered was the one that dealt with facts in the case.

To the point of this statement. I owe an apology to Mr. Kleinman and to Mr. Wall for allowing this to fall into Mr. Wiseharts [sic] hand. I marked myself an idiot for believing he would act ethically. He has deliberately submitted quotes that he knew were not valid in order to give the reader the impression that this was currently my belief. I had refused to do what he asked, so he fraudently [sic] submits this, aware that I had repudiated it to accomplish what he wanted. Had I thought back to October and his actions on the eve of the last hearings with his missile to the AAA on his charge against Mr. Liebowitz for partiality, followed by his refusal to submit proof, I should have expected this. I will leave the other material in his submission to others far more qualified than me to refute.

Respectfully submitted

/s/ Martin Freeman

but Wisehart had used them anyway, Kellwood contends that Wisehart, with the assistance of his paralegal Lipin, was attempting to create a completely false picture of events and was engaging in and continuing a pattern and practice of deception on this Court. As support for this, Kellwood called my attention to an incident in 1991 which had engaged the extensive attention of five state courts and two federal courts, in which Lipin, then Wisehart's client and paralegal (and Lipin being his paralegal on this case as well) were the subject of state court proceedings culminating in findings that Lipin had secretly and deliberately taken [17] and kept and copied an extensive adversary's file containing, among other things, privileged attorney work product, during a lawyers' conference with a Special Referee on her case,[18] and that Wisehart, knowing how she had obtained the documents, when confronted, "refused to divulge how Lipin had obtained the documents, asserting only that she had done so legitimately," *Lipin v. American Nat'l Red Cross*, Nos. 93 Civ. 1334, 92 Civ. 4455, 1996 WL 18901 (S.D.N.Y. Jan.17 1996), *aff'd*, 113 F.3d 1229 (2d Cir.1997), *cert. denied*, 522 U.S. 1047, 118 S.Ct. 689, 139 L.Ed.2d 635 (1998), and that Wisehart then endeavored to use the documents to force a "substantial" money settlement. Portions of the opinion of Chief Judge Kaye of the New York Court of Appeals are but one of the illuminating recitals of this incident.

On Friday, June 28, 1991, during the course of increasingly acrimonious pretrial proceedings marked by mutual accusation of abusive tactics, plaintiff [Joan Lipin] and Wisehart appeared at a hearing room in New York County Supreme Court to argue certain deposition issues before a Special Referee. Now employed as a salaried paralegal by her attorney, plaintiff took what she described as her customary place at the conference table. Already on the table at that spot was a stack of some 200 pages, the top sheet beginning:

"Weil, Gotshal & Manges

*memorandum*

December 8, 1989

To: File

From: Lawrence J. Baer

Re: *Joan Lipin v. American Red Cross* * * *

Meeting with Mary Stanton 9/15/89". The page continued with a summary of counsel's meeting with Stanton, a Red Cross employee, including Stanton's candid impressions of plaintiff and her recounting of Jacoby's legal advice regarding plaintiff's termination.

While the attorneys including the author of the file memorandum, WGM associate Lawrence Baerwere absorbed in heated exchanges regarding the deposition, plaintiff read the first few pages, then shifted the documents (which she concealed in a folder) to her lap and continued to read, undetected for more than an hour. In plaintiff's own words: "I wasn't reviewing those papers, I was reading them." Immediately, she recognized the document as containing the lawyer's interview notes of Red Cross personnel, including defendant Bender, as well as deposition digests.

Martin Freeman Arbitrator

**17.** As to Lipin's vigorous objection at ¶¶ 70–71 of her affidavit of September 23, 1999, as to Kellwood allegedly knowing the falsity of its statement in its brief that she "stole a stack of privileged documents from opposing counsel," I note that the word "stole[n]" was the very word used twice by the Court of Appeals for the Second Circuit describing the finding by New York Supreme Court on this subject. *Lipin v. American Nat'l Red Cross*, Nos. 96–7195, 96–7193, WL 279912, at *1 (2d Cir. May 22, 1997).

**18.** Lipin knew from her employment as a paralegal this was improper, by reason of the attorney-client privilege, but did so deliberately. *Lipin v. Bender*, 193 A.D.2d 424, 426–27, 597 N.Y.S.2d 340, 342 (1st Dep't 1993), *aff'd*, 84 N.Y.2d 562, 644 N.E.2d 1300, 620 N.Y.S.2d 744 (1994).

At the break, plaintiff slipped the documents into a Redweld file "for [her] own protection," determined to retain them as "material evidence," and in the corridor told Wisehart about the documents and what she had done. Wisehart said that he would not himself read the documents until he had received a "second opinion." Plaintiff told Wisehart that she would not give him the documents unless she could keep a copy. During the luncheon recess plaintiff returned to Wisehart's office where she made three photocopies, "Bates-stamped" them, and-except for one copy she later took home with her placed the documents in a locked filing cabinet to which she had a key.

According to plaintiff, Wisehart counseled her that if Baer discovered his documents missing, she must tell the truth: that she had picked them up by mistake. Plaintiff responded that she had not picked them up by mistake, but deliberately,[19] and would not return the originals unless asked to do so by WGM. In consultation with the lawyer who had referred plaintiff's case to him, Wisehart concluded that any claim of privilege as to the documents had been lost as a result of Baer's careless handling of them, and on Sunday evening, June 30, he read through them.

Promptly the next morning, Wisehart wrote to Jacoby that "a recent development causes me to suggest that immediate attention should be given to the subject of settlement from all points of view." At a meeting the following afternoon, Wisehart confronted defense counsel with the documents and demanded the immediate termination of defendant Bender, a "substantial" monetary settlement and other reparations. When Ja-

coby asked how he had obtained the documents, Wisehart demurred, citing attorney-client privilege, asserting only that plaintiff had obtained them legitimately. Wisehart further cautioned Jacoby that plaintiff had retained a copy "for her own protection" and he had no control over what she might do with the information, suggesting that she could release it to the press.

On Wednesday, July 3, 1991, defendants moved for a protective order pursuant to CPLR 3103, and that very day the parties appeared in court. Wisehart consented to WGM's request for interim relief, including that plaintiff (herself present in the courtroom) turn over to her lawyer "everything in her possession," and that he secure all copies in his vault. Over the Fourth of July holiday, however, plaintiff hand-copied parts of the documents from the set she had retained at home, returning the documents to Wisehart on Friday, July 5. Even then, plaintiff kept her handwritten notes, and the documents were placed in a locked cabinet for which she had a key.

*Lipin v. Bender*, 84 N.Y.2d 562, 566–67, 644 N.E.2d 1300, 1300–01, 620 N.Y.S.2d 744, 744–45 (1994). The Appellate Division had previously commented:

[I]t was plaintiff herself who seized the opportunity presented to obtain an unfair advantage over her adversaries in this litigation. Her improper conduct was then compounded by counsel, who could have readily returned the documents or sought further direction from the court, rather than permitting his client to return to his office and make copies of the disputed documents and then sought to take advantage of such

---

**19.** Footnote by the Court: The Appellate Division had earlier observed:

Plaintiff further revealed that counsel had advised her, on the day the documents were obtained, that "you can't lie so you have to say yes, you by mistake picked up his documents." The plaintiff insisted, however,

that the documents were not taken by mistake, but rather, "it was my own recognizance and my own protection."
193 A.D.2d 424, 597 N.Y.S.2d 340, 342 (1st Dep't 1993), aff'd, 84 N.Y.2d 562, 644 N.E.2d 1300, 620 N.Y.S.2d 744 (1994).

improper conduct by scheduling a "settlement conference."

*Lipin v. Bender*, 193 A.D.2d 424, 426–27, 597 N.Y.S.2d 340, 342 (1st Dep't 1993), *aff'd*, 84 N.Y.2d 562, 644 N.E.2d 1300, 620 N.Y.S.2d 744 (1994). For other aspects of this matter with similar judicial observations, see *Lipin v. American Nat'l Red Cross*, Nos. 93 Civ. 1334, 92 Civ. 4455, 1996 WL 18901 (S.D.N.Y. Jan.17 1996), *aff'd*, 113 F.3d 1229, 1997 WL 279912 (2d Cir. May 22, 1997), *cert. denied*, 522 U.S. 1047, 118 S.Ct. 689, 139 L.Ed.2d 635 (1998).

Kellwood also called to my attention *Lightfoot v. Union Carbide Corp.*, No. 92 Civ 6411, 1997 WL 543076, at *2 n. 2 (S.D.N.Y. Sept. 4, 1997), *aff'd*, 175 F.3d 1008 (2d Cir.), *cert. denied*, — U.S. —, 120 S.Ct. 56, 145 L.Ed.2d 49 (1999), where Wisehart, attorney for the plaintiff, in an apparent effort to evade an undesired conclusion, moved, without basis, to recuse Judge Harold Baer of this Court, occasioning the following footnote in Judge Baer's opinion:

> While on the subject of plaintiff's attorney's conduct, the Court notes that plaintiff's counsel, Arthur Wisehart, has a peculiar habit of filing recusal motions. Not only has he previously filed a recusal motion in this case (which was denied), but defendants identify at least four other cases in which he has filed such motions, often based on evidentiary or other rulings of the judge in question. On at least one occasion, the judge in question chastised Mr. Wisehart and noted that "[t]he material that Mr. Wisehart has provided on the recusal subject is so scurrilous and so baseless and so ridiculous that I cannot even

begin to be fair to any parties in this case after reading this." *Lipin v. American Nat'l Red Cross*, 1997 WL 279912 (2d Cir. May 22, 1997) at *5 n. 1 (quoting New York State Supreme Court Justice Moskowitz). While the same is not true of the instant recusal motion, Mr. Wisehart's practice calls into question either his good faith and adherence to Rule 11 in filing such motions or his grasp of the applicable legal issues. Recusal is a drastic remedy, not to be taken lightly. Mr. Wisehart's practice of filing recusal motions when he disagrees with a judge's rulings undermines the gravity with which such motions should be treated and impugns judicial integrity by implying rampant bias.

Wisehart responded on September 23, 1999, to Kellwood's bringing the foregoing to my attention by filing not only a motion to strike Kellwood papers containing all this, but in addition Wisehart now charged 1) that Kellwood's lawyers, Morgan, Lewis & Bockius, and its partner Christopher Parlo (who coincidentally had been involved with the Lipin action at the time Lipin took the documents discussed), *see supra* pp. 251–54, had participated in an "entrapment conspiracy"[20] in the *Lipin v. Bender* case, supra, by intentionally placing the to-be-"purloined"[21] documents in front of where Lipin would sit[22] so she could take them[23] and 2) Wisehart further charged Kellwood's attorney Wall and his firm Morgan, Lewis *in this case* with "attempted extortion" for sending Wisehart a demand letter for the $145,452.68 that the panel had earlier awarded to Kellwood to

---

**20.** Wisehart's September 23, 1999, memorandum, page 17–18, reads:

"[C]ounsel for defendants including Mr. Parlo and his firm Morgan Lewis & Brockius, LLP, participated in an entrapment scheme ... [They] intentionally placed these documents in front of Ms. Lipin as part of their entrapment conspiracy."

**21.** *See Lipin v. Bender*, 216 A.D.2d 131, 629 N.Y.S.2d 3 (1st Dep't 1993).

**22.** Lipin undercuts this in her September 23, 1999, affidavit, paragraph 84, by allocating to Morgan, Lewis' attorney Parlo knowledge of a litany of those who could have placed the file "entrappingly" in front of her, which litany includes the Special Referee himself as a possibility.

**23.** This argument, one notes, was never raised in the state court hearings.

be paid by Wisehart. On the basis of this asserted "attempted extortion as defined in Black's Law Dictionary,"[24] Wisehart now seeks from this Court an award of *treble damages* against Morgan, Lewis and its two partners for "deceit [and] collusion with intent to deceive the court" under N.Y. Jud. Law § 487 (McKinney 1983). There is not a scintilla of evidence before me to support any of these claims against Morgan, Lewis or Parlo or Wall-other than Wisehart's and Lipin's self-serving, conclusory statements they are so. The defamatorily-described claims are flatly rejected.

Thereafter, Kellwood, as it had been given leave in the panel's June 23 rulings to submit documentation supporting its final costs, sought a supplemental award for the final billing statements of the arbitrators. On October 20, 1999, the panel issued its second ruling on fees and directed Wisehart to pay an additional $7,784.96. In response thereto, Wisehart again moved on November 8, 1999 for leave to supplement and amend the petition herein.

Oral argument was heard before me on November 19, 1999. While Kellwood had advised me it was waiting until all the panel's awards were filed to move to confirm,[25] it had not formally so moved, and, at that time, Kellwood orally placed on the record its motion to confirm the arbitration awards.

■ Turning first to Wisehart's motion to strike Kellwood's said Memorandum of Law in its entirety, Kellwood's memorandum is not abusive or improper if Kellwood has a basis for its contentions and those contentions are responsive to some issue or issues. In light of Wisehart's representation to this Court as to Freeman's internal memoranda being "dissents", and the arguments he made therefrom, Kellwood obviously had the right to put evidence before the Court supporting its belief that Freeman had *not* dissented, and that indeed Freeman had so advised

Wisehart, before Wisehart filed papers making that claim before me. Kellwood's proffer to show that Wisehart has, to other courts' awareness, acted similarly in the past is relevant to whether this Court should assess what it finds to be his actions here as unintended, or what weight to give to the conclusions he draws from the Freeman memoranda of June 5 and July 3 that he claimed were dissents, when apparently told to the contrary, and how his letter of attack to the AAA against arbitrator Liebowitz, *see infra* pp. 264–67, should be viewed, not only in its totality, but specifically the last paragraph where Wisehart is conjecturing about a "vacancy" on the panel which might come to pass. *See supra* pp. 245–46 and *infra* note 39. Thus, extensive judicial recitals of Wisehart's conduct in other cases could be quite relevant to this Court's assessment of the panel's conclusions as to Wisehart's intentions behind his conduct during the arbitration *here* where the unanimous panel eventually bluntly sanctioned him for misconduct. Under these circumstances, Kellwood's submissions and arguments are neither abusive nor improper. Accordingly, I deny Polin's motion to strike Kellwood's memorandum in opposition.

■ Turning to Polin's numerous collateral attacks on the award, "[t]he showing required to avoid summary confirmation of an arbitration award is high and a party moving to vacate the award has the burden of proof." *Willemijn Houdstermaatschappij, BV, v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir.1997) (citation omitted). "Moreover, '[a]rbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation.'" *Id.* (citation omitted). "The 'primary purpose' of the F[ederal] A[rbitration] A[ct] is 'ensuring that

---

**24.** Pet'r Mem. of Law in Supp. dated Sept. 23, 1999, at 22.

**25.** Resp't Supp. Mem. of Law in Opp. filed Sept. 10, 1999, at 3.

their private agreements to arbitrate are enforced according to their terms.'" *Baker Marine (Nig.) Ltd., v. Chevron Ltd.*, 191 F.3d 194, 197 (2d Cir.1999) (quoting *Volt Information Sciences, Inc. v. Board of Trustees*, 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)). Under the Act, an arbitration award may be vacated under 9 U.S.C. § 10(a):

> (1) Where the award was procured by corruption, fraud, or undue means.
>
> (2) Where there was evident partiality or corruption in the arbitrators, or either of them.
>
> (3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.
>
> (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). "Under the FAA, the validity of an award is subject to attack only on those grounds listed in § 10, and the policy of the FAA requires that the award be enforced unless one of those grounds is affirmatively shown to exist," *Wall Street Assocs. L.P. v. Becker Paribas Inc.*, 27 F.3d 845, 849 (2d Cir.1994), by clear and convincing evidence, *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir.1988); *Lafarge Conseils et Etudes, S.A. v. Kaiser Cement & Gypsum Corp.*, 791 F.2d 1334, 1339 (9th Cir.1986). "In addition to statutory grounds, ... a district court may vacate arbitration awards when the arbitrators acted in manifest disregard of the law." *Willemijn*, 103 F.3d at 12. The reach of this doctrine is severely limited. *Halligan*

*v. Piper Jaffray, Inc.*, 148 F.3d 197, 202 (2d Cir.1998), *cert. denied*, 526 U.S. 1034, 119 S.Ct. 1286, 143 L.Ed.2d 378 (1999).

Polin has made a plethora of arguments that the award should be vacated under each of the four subsections of 9 U.S.C. § 10(a) above.

Starting with § 10(a)(1), to vacate under this section, it must be abundantly clear that "the award was procured by corruption, fraud, or undue means." *Karppinen v. Karl Kiefer Mach., Co.*, 187 F.2d 32, 34 (2d Cir.1951). For reasons that follow, I do not find that Polin has established any of the allegations by an "abundantly clear," an "affirmatively stated," or a "clear and convincing" standard—or by any other standard.

■ Here Polin alleges that the award was procured by "undue means or fraud or corruption" because Kellwood's counsel, as opposed to Kellwood itself, paid arbitrator Liebowitz on two of his invoices to Kellwood for his agreed fees.[26] This has been discussed extensively earlier and must be touched on again as it is the basis of different claims by Polin, but to repeat, there being some "glitch" in a payment from Kellwood's corporate offices, and with Liebowitz and Wall *all* on the phone, Wisehart's asserting "and that would cause us substantial injury to have that kind of delay[,]" and both lawyers were told by Liebowitz that he could suspend the proceedings until he was paid, and Liebowitz continued: "if the next one is similarly for the same reason subject to the glitch, the same thing happens, so it does concern Arthur [Wisehart], because if that is the procedure and I decide to invoke, he would not have any other proceedings until the bill is paid," *see supra* note 5, Kellwood's law firm quickly paid the first two invoices during the month of June 1998 in order to avoid any delay. Kellwood paid directly

---

**26.** This claim, it must be remembered, is made against a background that it was Wisehart who proposed Liebowitz as the neutral arbitrator, *see supra* p. 241, and it was Wisehart who negotiated and signed the arbitration agreement, which provides that Kellwood was to pay Liebowitz' fees.

all Liebowitz' other invoices. Thus, the fact that two payments to the neutral arbitrator came through Kellwood's law firm as opposed to Wisehart's negotiated method of some Kellwood corporate account does not, against this background, in any way establish that the award was procured by "undue means, fraud, or corruption."

■ Polin's next contention that the award was procured by "undue means or fraud or corruption" is based on arbitrator Liebowitz' May 28, 1998, threats "to discontinue his services as such unless Kellwood promptly made certain payments that he claimed to be due to him." This is not only in the same vein as above but also is a distortion of the said Wisehart secretly recorded conversation. *See supra* note 5. What Liebowitz did say was: "I would like to know what kind of time frame we will have in the future, when I can expect payment." Liebowitz then informed both parties that he had the authority under the agreement to suspend, if necessary, the proceedings if payment was not prompt. In this, he was accurately paraphrasing the AAA rule applicable to this arbitration which reads, "[i]f Arbitrator compensation or administrative charges have not been paid in full, the administrator may so inform the parties in order that one of them may advance the entire payment. If such payments are not made, the tribunal may order the suspension or termination of the proceedings." (Tr. of Oct. 29, 1998, at 49–50). Liebowitz was then "advanced the entire payment" as observed above. These claims are meritless.

27. I note that a $2000 per diem fee breaks down to $250 per hour for an eight hour day. This is not "so excessively high" or "so far beyond the applicable standard for such services" as to constitute a separate ground for vacatur.

28. The transcript reads:

ARBITRATOR LIEBOWITZ: Thank you, Mr. Wisehart. Mr. Wall for Kellwood.

MR. WALL: Mr. Arbitrators, this case can be summarized in three words. Disappointment, exaggeration and desperation.

■ Polin next alleges that the award was procured by "undue means or fraud or corruption" because arbitrator Liebowitz—who is a lawyer—was being paid a per diem rate of $2000, Wisehart asserting that that fee was double the fee Liebowitz listed in the Federal Mediation and Counsel Service. But Wisehart had proposed Liebowitz and had signed him on having full knowledge of the $2000 a day fee from a letter that Liebowitz sent to Wisehart in January of 1998, announcing his willingness to accept the appointment and stating his fee. This was three months before the arbitration proceedings began, and Wisehart never questioned the fee before or during the proceedings.[27]

■ Polin next asserts several additional contentions that the award should be vacated under § 10(a)(1), alleging various Kellwood misconduct which resulted in the award being procured by "undue means or fraud or corruption." First, that Kellwood's counsel "falsely" represented in its opening statement that Kellwood discontinued the She Knows!! because it lost eight million dollars.[28] Polin argues that this statement was false because that eight million dollar figure failed to take into account a one million dollar plus offset that Kellwood had as a result of its lawsuit against Enteks who had supplied poor quality cloth which contributed to She Knows!!'s demise. Wisehart having made the panel aware of his contention that the eight million dollar figure was inaccurate, the panel thereafter took note of the offset.[29] Second, Wisehart accuses

Disappointment. There is not a single person in the Kellwood world who does not recognize the disappointment associated with the failure of the She Knows venture. That venture was an operation for approximately fifteen months. It lost $8 million dollars in fifteen months. Mr. Polin was the titled president of that operation. (Tr. of Apr. 1, 1998, at 33).

29. The transcript reveals that the arbitrators heard Wisehart's argument and debated the actual loss to She Knows!! caused by the Enteks supplied cloth, (Tr. of June 1, 1998, at

Kellwood of "falsifying financial information involving She Knows!!" and "failing to have separate, specific financial statements prepared in accordance with Generally Accepted Accounting Principles" in order to conceal some alleged tortious interference by defendant Harding. As to this, Polin failed to present to the panel or now to this Court any evidence to support his contentions.[30] Specifically, he presented no evidence that the financial information supplied was false nor evidence that this information and Kellwood's decision not to keep separate balance sheets for the She Knows!! division was designed to conceal an allegedly tortious interference by Harding. Third, Wisehart accuses Kellwood's counsel of destroying certain cloth bolts which Wisehart argues here were relevant to Polin's claims. Regarding this alleged spoliation of evidence, the panel considered this claim and specifically found that the bolts of cloth and product samples were not relevant to the case, see supra note 31, and moreover, even though not relevant, Polin was given an opportunity to examine the original cloth patches from the *Enteks* matter of which Wisehart apparently made nothing. In fact, Kellwood in the *Enteks* matter had pleaded in its answer a damage figure which Wisehart used to argue the true loss caused by She Knows!! was not eight million dollars. In this connection I note that "[t]he fact that there is an argument against the truth of any of the statements [by counsel] does not establish that the arbitration award was the result of fraud." *Cook Chocolate Co. v. Salomon, Inc.*, 748 F.Supp. 122, 126 (S.D.N.Y.1990), *aff'd*, 932 F.2d 955 (2d Cir.1991).

Next, Polin turns to subsection two of 9 U.S.C. § 10(a) asserting "evident partiality or corruption in the arbitrators, or either of them." 9 U.S.C. § 10(a)(2). The burden of proof is on the party asserting bias, *Reed & Martin, Inc. v. Westinghouse Elec.*, 439 F.2d 1268, 1275 (2d Cir. 1971), and "evident partiality" means that "a reasonable person would have to conclude that an arbitrator was partial to one party," *Morelite Constr. Corp. v. New York City Carpenters Benefit Funds*, 748 F.2d 79, 83–84 (2d Cir.1984), or against a party. *Sun Ref. & Mktg. Co. v. Statheros Shipping Corp. of Monrovia, Liberia*, 761 F.Supp. 293, 302 (S.D.N.Y.), *aff'd*, 948 F.2d 1277 (1991).

To meet this burden, Polin makes the same distorted factual claims as to arbitrator Liebowitz' alleged threats to resign, dealt with in another context, which are refuted by the transcript, see supra pp. 256–57, the amount of his fee, see supra pp. 256–57, and his receipt of a part of his fee from Kellwood's counsel as evidence of partiality. But, as dealt with earlier, a review of the transcript of that May 28 telephone conversation[31] does not support the inference that "a reasonable person would have to conclude" that Liebowitz was partial to Kellwood or biased against Polin. Liebowitz, as observed earlier, whom Wisehart contracted to have Kellwood (and not his own client) pay, just wanted to be paid, and was merely informing the parties—accurately, as discussed elsewhere—that he had the authority to suspend the proceedings unless his fee was paid. This is hardly partiality to Kell-

218–221), Wall observing, "So if you accept his argument its not $8 million loss, it is $6.6 million in loss. And I suppose he is going to argue that if you only lose $6 million, then you shouldn't be fired." (*Id.* at 219).

**30.** The panel found:
Wisehart also accused Kellwood of destroying evidence and maintaining false financial records. He stated that the She Knows!! balance sheets were "obviously manufactured document[s]." (Tr. 436). He provid-

ed no support for his serious allegation. Wisehart also alleged that Kellwood deliberately destroyed evidence, i.e., several bolts of cloth and product samples, *which indeed were not relevant to the case*, and were disposed of after unrelated litigation was settled (9/18/98 Conf. Tr. 16).
(Arbitrators' Opinion of Apr. 10, 1999, at 39) (emphasis added).

**31.** *See supra* note 5.

wood. Indeed, in that phone call while discussing Liebowitz' fee delay, Wall saying to Wisehart, "I don't think that you have any business in this whatsoever[,]" Liebowitz contradicted him, saying that Wisehart *did* have a concern because if the proceeding were suspended Polin would obviously be effected. This hardly supports an inference that Liebowitz was biased against Polin. And even further Liebowitz, in pressing Wall to get his fees paid, stated that he was not going to "subsidize a multi-million dollar corporation" and did not want "Arthur" [32] to be injured by delay. This speaks only of irritation *against* Kellwood. The very payments Polin now complains of— after the adverse award— benefitted him at the time, when his lawyer Wisehart said that delay would "cause us substantial injury." [33]

Polin next argues that Liebowitz' partiality is shown by his alleged August 7, 1998, threat to discontinue unless at the conclusion of the hearings Polin, in response to questioning by Liebowitz, states that he had received a full and fair hearing. Polin alleges this threat was made in the presence of counsel for both parties but was not recorded, but there is no evidence that the threats were made. Since *Wisehart is the only one asserting this conversation ever took place, and he has submitted no affidavit as to its existence*, this issue is therefore not competently before me, and I decline to address it. Significantly, the first time Wisehart asserted this allegation was in the AAA letter submitted on October 23, 1998, which is nine days after the panel dismissed two of Polin's three claims, two days after the panel refused Polin's request to subpoena four additional witnesses, the Friday before the Monday in which Kellwood was to begin its defense, and seven days before the parties had agreed that the arbitration proceedings

would end. The panel found, "The allegations of the [AAA] letter were clearly false and known by Wisehart to be false. Panel Chair Liebowitz never stated that he would resign unless Wisehart agreed he received a fair hearing, nor did he threaten to resign if he did not receive payment." (Arbitrators' Opinion of Apr. 10, 1999, at 45). Additionally, Liebowitz never conducted an inquiry at the end of hearings, and Kellwood's counsel, Wall, *has* stated under oath that such a threat never occurred. Moreover, when the panel gave Wisehart an opportunity to support his allegations, Wisehart declined to do so. *See infra* pp. 264–66. Given the seriousness of these allegations, if true, one would have expected Wisehart to react in early August when the threat was made and not in late October as the proceedings were coming to an end.

■ Polin also argues that Kleinman, the arbitrator chosen by Kellwood, was evidently partial to Kellwood because he failed to disclose on his resume that he had performed services for the American Arbitration Association. Polin states that he would not have signed the arbitration agreement if he had known that Kleinman had done legal services for the AAA. The AAA had essentially nothing to do with this arbitration. Kleinman's past service for the AAA could not possibly create an impression that Kleinman would be partial towards Kellwood or against Polin. The argument has no merit.[34]

■ Polin argues that the very fact that the award granted Kellwood the remedy of one half its arbitration costs shows that the panel was biased against Polin. Polin also argues that bias was shown by the arbitrators' dismissal of the age discrimination claims as frivolous. The mere fact that the arbitrators find in favor of the opposing party on the basis of evidence

---

**32.** Liebowitz was at that point calling Wisehart by his first name.

**33.** *See supra* note 5.

**34.** I note that arbitrator Freeman—that Wisehart selected for Polin—had been a recent client of Wisehart's.

coming out during the arbitration does not establish partiality. *LLT Int'l, Inc. v. MCI Telecommunications Corp.,* 18 F.Supp.2d 349, 354 (S.D.N.Y.1998).

 In same vein, Polin alleges bias because the arbitrators denied his request for certain documents. The panel's decision not to order the production of certain documents or certain witnesses does not support an inference of bias. Arbitrators have the power to determine what is relevant, material, and cumulative, and to interpret the procedural rules of the proceeding. Bias is not even established by showing that an arbitrator consistently agrees with the arguments of one side and repeatedly finds in their favor. *Bell Aerospace Co. v. Local 516 Int'l Union, United Auto., Aerospace & Agric. Implement Workers,* 500 F.2d 921, 923 (2d Cir.1974).

Polin argues that the bias which Liebowitz had against Polin is attested to by attorney Martin Seham, who came in at the end as special counsel to Wisehart, representing him at the October 28 and October 29 hearings, which were held as a courtesy to Wisehart in order to give him an opportunity to explain his prima facie defamatory letter to the AAA. *See infra* pp. 264–66. Seham described Liebowitz as "demonic and irrational" and "bizarre". I give Seham's characterizations no weight. Seham, a long-time friend of Wisehart, present as Wisehart's attorney, had an obvious partiality. When, during this hearing on the issue of Wisehart's letter to the AAA, arbitrator Liebowitz indicated there was no basis for briefs to be submitted thereafter, Seham's rude responses highlight his attitude:

> CHAIRMAN LIEBOWITZ: There are no facts to underline your argument.
>
> MR. SEHAM: I don't know whether this guy has the attention span to read a whole brief.
>
> CHAIRMAN LIEBOWITZ: Which guy are you talking about?
>
> MR. SEHAM: There is a guy making jokes. In any event, the reading ex-

perience is different than the individual witness mode.

> CHAIRMAN LIEBOWITZ: It's a question of either testimony or we take representations. You either prove what you've got or not. Not in a brief. You can argue, in a brief you can argue whatever you want, but it's got to be based on the record of evidence.
>
> ARBITRATOR KLEINMAN: How do you argue farther when no facts have been presented?
>
> MR. SEHAM: There are facts.
>
> ARBITRATOR KLEINMAN: Not in this hearing. What was in a brief, you then provide all the facts and then argue from those facts, which you didn't present here.
>
> MR. SEHAM: The issue here is an issue that you guys have developed, and the issue is the sanctions.

(Tr. of Oct. 29, 1998, at 88–89). Additionally significant is the observation of Liebowitz' conduct by Freeman, the arbitrator Polin had appointed, in a statement made after these events:

> ARBITRATOR FREEMAN: On Monday morning I stated my experience in April, June and through August. At no time did I find Liebowitz anything but impartial. I would like to add to that, including these few days. I left out the August 14, the September and all conferences [sic] calls. I think he has been, if anything, initially very much, leaning toward one side, to give the Plaintiff [Polin] every opportunity. I saw that consistently.
>
> I think an accusation of unfairness, it is simply unacceptable.

(*Id.* at 80–81).

Polin in this context argues that the Freeman's internal memoranda and "dissents" exhibit the arbitrators' partiality. These are discussed in detail *supra* pages 250–51. There is no evidence in any of these documents of partiality by the other two arbitrators, and Freeman's observa-

tions in his August 19, 1999 memorandum about Wisehart, who had appointed him, *supra* pp. 241–42 and note 16, are based on and supported by the record, and I note that notwithstanding, Freeman found in Polin's favor on the fraudulent inducement claim in a dissent.

 Polin next asserts the award should be vacated under 9 U.S.C. § 10(a)(3) because "the arbitrators were guilty of misconduct ... in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(3). "Courts have interpreted section 10(a)(3) to mean that except where fundamental fairness is violated, arbitration determinations will not be opened up to evidentiary review." *Tempo Shain Corp. v. Bertek*, 120 F.3d 16, 20 (2d Cir.1997). Arbitrators are not required to "follow all the niceties observed by the federal courts." *Bell Aerospace*, 500 F.2d at 923. While it is clear from the text of the statute that arbitrators should hear all evidence proffered that is "pertinent and material," an error in their determination of "pertinent and material" must be one that deprives a party of a fundamentally fair arbitration process. *Tempo*, 120 F.3d at 20. Additionally, an arbitrator is not required to hear all evidence proffered, *id.*, because an arbitration panel "need not compromise speed and efficiency, the very goals of arbitration, by allowing cumulative evidence." *Max Marx Color & Chem. Co. Employees' Profit Sharing Plan v. Barnes*, 37 F.Supp.2d 248, 251 (S.D.N.Y. 1999). An arbitrator is merely required to give each party an adequate opportunity to present its evidence and argument. *Tempo*, 120 F.3d at 20.

 Polin claims that the arbitrators engaged in misconduct by granting Kellwood's motion to quash Polin's subpoena for James Jacobsen and by refusing to sign a subpoena duces tecum directed at

D.L. Thompson dated October 17, 1998, requesting the production of financial documents, and that these financial records "would have exposed the mendacious nature of the decision to shut down She Knows!! as an entity eliminate Chuck Polin from Kellwood upon the pretext of financial reasons to be a hoax." (Pet'r Pet. to Vacate ¶ 71). Regarding the Jacobsen subpoena, the panel granted Kellwood's motion to quash apparently based on the evidence, discussed earlier at page 3, which was that the arbitration agreement itself precluded any further discovery except for two circumstances which were not applicable, and that Polin had already been provided with over 5000 pages of financial records. And I note that, Jacobsen *did* testify as a witness for Kellwood and was subject to cross examination. With regard to Polin's subpoena duces tecum to Thompson, this was issued after the close of Polin's direct case. The panel, concerned that Wisehart was ·attempting to relitigate his direct,[35] chose to first hear Kellwood's defense before determining whether the subpoena would be relevant to Kellwood's defense. This was within their power.

 Polin next argues that the panel engaged in misconduct by refusing to hear "pertinent and material" evidence and points to a telephonic conference on August 14, 1998, one week after the close of Polin's direct case. This refers to Wisehart's offer of proof as to Paul Celona and Sherri Polivka discussed elsewhere. But the panel accepted the offer and heard Celona, and while it rejected his offer of proof as to Polivka, I note that despite years of discovery in this litigation it appears that Wisehart never spoke to Polivka, never secured a statement from her, and failed to list her on his witness list. Moreover, as part of Kellwood's case, Polivka did later testify and was subject to cross-examination. Given the circumstances, there was no misconduct here.

**35.** *See supra* note 7 for the verbatim expressions of concern.

Polin argues that the panel engaged in "willful misconduct" by finding Polin's age discrimination claim "frivolous", and the arbitrators "acted irrationally" in refusing the credit Polin's testimony as well as Holding's testimony. But disagreeing with the panel's assessment of the evidence and its conclusions is not sufficient to vacate an arbitration award under § 10(a)(3).

Wisehart argues generally that the "dissents" of Freeman exhibit the panel's refusal to hear evidence which prejudiced Polin's rights. As discussed earlier, *supra* pp. 250–51, I consider only the April 10, 1999 and October 26, 1998 dissents. As to the October 26 dissent, Freeman simply dissents on the dismissal of the age discrimination and fraud in the inducement claims and does not mention anything about the other arbitrators refusing to hear evidence. As to the April 10 dissent, a perusal of the dissent reveals that Freeman disagrees with the weight and relevance given to certain evidence. He states, "Now to the crux of the matter, Kleinman has stated that the discrepancies of when Polin and Harding first spoke is not material. I believe it is of great import." (Arbitrators' Opinion of Apr. 10, 1999, at 50). There is no statement whatever about a refusal to hear evidence, but only a disagreement on what evidence to credit and what not. Moreover, these dissents do not exhibit a denial of "fundamental fairness" in this arbitration.

Polin argues that the panel engaged in misconduct by holding sanction hearings that "tortiously interfered with Polin's due process right to counsel." The transcript of the "sanction hearings" reveals that the hearings, after all the evidence was complete on the merits, were offered as a courtesy to Wisehart in order to allow him an opportunity to explain what the panel viewed as his prima facie defamatory letter to the AAA, threatening Liebowitz' further relationship with the AAA and thus his livelihood. Wisehart declined to respond. The panel did not deny Polin a fundamentally fair arbitration process by granting Wisehart the opportunity to explain this extraordinary and unexpected damaging action. These hearings took place on October 28–29, 1998, which is two months after the close of Polin's direct case. Polin was not denied the opportunity to present evidence or any way prejudiced with in the meaning of § 10(a)(3) by these "hearings." Regarding Polin's assertion that this was a denial of his due process right to counsel, first, the FAA contains no provision requiring parties to be represented by counsel in arbitration proceedings. But second, where a party chooses to be represented, it cannot be said that the arbitrators engaged in misconduct because they gave the attorney an opportunity to explain what appeared to them as outrageous action. *See infra* pp. 264–65 for arbitrator Kleinman's remarks.

The argument of "willful misconduct and misbehavior" by the arbitrators that Polin makes based on an affidavit of John W. Whittlesey, Esq., hardly need comment. Whittlesey was a part-time law associate of Wisehart, and Whittlesey's sworn assertion that in his expert view Polin had established a prima facie case of age discrimination and that therefore the imposition of a sanction for a "frivolous" age discrimination claim was unwarranted is no more than a supplemental brief, and entitled to no *evidentiary* weight. Nor need credibility be given to such an insider's non-neutral purported expert opinion. *See Stachniak v. Hayes,* 989 F.2d 914, 925 (7th Cir.1993).

Polin alleges that "[r]espondents, respondents' counsel and the Arbitrators tortiously interfered with the testimony of witnesses and subsequently caused the arbitrators to quash petitioner's subpoenas of Joseph and D.L. Thompson." (Pet'r Mem. of Law in Supp. dated Aug. 11, 1999, at 9–10). I observe that Wisehart's rather inflammatory choice of words—"tortiously interfere"—is without support. Polin apparently in this context objects to the pan-

el's decision not to issue these subpoenas both dated October 17, 1998. This is dealt with *supra* pages 261–62. I find no misconduct in the panel's decision.

Polin makes three separate arguments about Liebowitz' alleged dereliction of duty constituting misconduct. First, Polin argues that Freeman's "dissents" reveal that Polin's age discrimination claim was dismissed because of *Kleinman,* Kellwood's partisan arbitrator, and not because of Liebowitz. This argument was dealt with *supra* pages 250–51, 260–61 and note 16, Freeman having repudiated these alleged "dissents". Second, Polin argues that the threat and imposition of a sanction award were improper and violated the role of a neutral arbitrator. This argument is dealt with *infra* pages 264–67. Third, Wisehart states that "arbitrator Liebowitz abandoned all pretense of neutrality by appointing arbitrator Kleinman, a partisan arbitrator, to function as the grand inquisitor of the arbitration panel with regard to punitive proceedings." However, after Wisehart's letter to the AAA attacking Liebowitz' reputation, it was quite appropriate to have Kleinman chair the proceeding since he was an attorney and Freeman was not. Polin has in no way established Liebowitz' misconduct with these three allegations.

 Polin argues that "[t]heir [presumably Kleinman and Liebowitz'] misconduct on a continuing basis has come to light in the record of extensive *ex parte* communications which they have engaged in with Kellwood's counsel throughout the extended period in which they have collaborated to destroy or incapacitate the law firm of WISEHART & KOCH through the imposition of sanctions that

they had no jurisdiction to impose." (Pet'r Mem. of Law in Supp. dated Nov. 8, 1999, at 7). Polin cites no evidence for this allegation. The *ex parte* conversations he lists in ¶ 153 of his Petition to Vacate all involve conversations between Liebowitz and Kleinman. Both being arbitrators, there is no misconduct. With regard to the alleged *ex parte* conversations in ¶ 154 of that petition, some those conversations were referenced in Freeman's "dissent" of July 3, which Freeman repudiated. I do not find that the remaining conversations were improper just because they took place. Polin has presented *no evidence that substantive issues were discussed.* The way the agreement was structured there had to be conversations between and among the participants in this arbitration, and everyone had to know this. The agreement required Kellwood to pay for all the arbitration expenses and all such presumably had to be arranged through them. Kellwood was also paying the expense of its own arbitrator, Kleinman, and the fee of the neutral arbitrator, Liebowitz. The other alleged *ex parte* conversation cited in ¶ 154 has to do with procedures, scheduling, arranging for transcripts. Nothing is shown to be improper. In fact, Wisehart was specifically aware these conversations were occurring. On May 28, 1998, within Wisehart's hearing on the surreptitiously-recorded phone call, Liebowitz referred to conversations he was having with Wall [36] and directed Wall to contact Kleinman because Liebowitz was unable to.[37] Polin has no basis to claim that all of these conversations constituted misconduct. Additionally, Polin cannot argue that the mere occurrence of an *ex parte* conversation constitutes misconduct when the record

---

**36.** *See supra* note 5.

**37.** While discussing the order of witnesses to appear, Liebowitz said the following in Wisehart's hearing to which Wisehart remained mute:

MR. LIEBOWITZ: That's it. It will be after Mr. Holding on the 1st we will have the whole term. That was housekeeping item

number 1 that I wanted to bring up. And I got a call from Mr. Kleinman. Would you be kind enough to advise him, Steve, that I couldn't get back to him and—

MR. WALL: I will leave him a message.

MR. LIEBOWITZ: There will be an argument on the motion and there will be a ruling. (Tr. of May 28, 1998, at 14–15).

reflects that his lawyer Wisehart and his paralegal Lipin engaged in *ex parte* conversation with arbitrator Freeman. After being chastised for discussing a motion with Freeman, Wisehart responded that he did not see a problem with the conversation since Freeman was a partisan arbitrator.[38] I find no misconduct here.

For Polin's final argument under § 10(a)(3), Wisehart states: "The punitive award of sanctions against petitioner's counsel [Wisehart] is an attempt by respondents' counsel [Wall] in collusion with arbitrators Liebowitz and Kleinman to obstruct justice by incapacitating petitioner's counsel to make it impossible to prosecute claims for obstruction of justice in the form of the admitted destruction of relevant evidence [the bolt of cloth and product samples from the *Enteks* matter] by respondents' counsel or their law firm, and also the suppression of the accounting records that are needed, exposes the fraudulent basis of the contentions made by them invalidating the arbitration decision." (Pet'r Mem. of Law in Supp. dated Nov. 8, 1999, at 15). There is no evidentiary support for the collusion claim, and all the rest has been discussed and rejected earlier in connection with other Wisehart arguments.

■■■ Polin next makes a number of arguments under the fourth and last subsection, 9 U.S.C. § 10(a)(4): "Where the arbitrators exceeded their powers." There is no dispute that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). The inquiry here therefore "focuses on whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." *DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 824 (2d Cir.1997), *cert. denied*, 522 U.S. 1154, 118 S.Ct. 1180, 140 L.Ed.2d 187 (1998).

■■■ Polin argues that the award granting Kellwood half of its expenses, including attorneys' fees, is in violation of ¶¶ 1, 7, and 8 of the arbitration agreement in that the agreement only allows the panel to grant remedies only to Polin and not to Kellwood. However, the parties' arbitration agreement incorporated the National Rules for the Resolution of Employment Disputes of the American Arbitration Association giving the panel broad remedial power, and providing that the panel "may grant any remedy or relief that the arbitrator deems just and equitable, including any remedy or relief that would have been available to the parties had the matter been heard in court." Since this case had started as an action in this Court and was to come back to this Court for review, the panel could grant any remedy that would have been available under a court's inherent power and, explicitly, to protect the panel's integrity and the integrity of the arbitration process generally, which integrity the panel, headed by a lawyer, felt was being badly abused.[39]

---

**38.** The transcript reads:

> MR. WISEHART: We can get the AT & T people to put in the other arbitrators if that is going to be an impediment. I have spoken with Mr. Freeman about this, just yesterday, and he says that our request for the information that the subpoena would require has his full support. So I don't know what, I don't see what point there is in making that kind of a technical argument.
>
> MR. WALL: Otherwise, you had an ex parte conversation about the motion with an arbitrator without the presence of any one else, in and of itself is a problem.
>
> MR. WISEHART: I don't see that it is a problem, he is a partisan arbitrator, you know that. But I am perfectly willing to set it up so that all the parties, arbitrators can hear. I asked him about his availability. (*Id.* at 4).

**39.** Liebowitz, the neutral arbitrator, who had been with the AAA for years and had been proposed in a letter by Wisehart to Wall, was

Perhaps even more distressing to the panel was Wisehart's refusal to respond when the panel gave him an opportunity (at the end after all the evidence had been received on the merits of the case itself) to tell them,[40] as arbitrator Kleinman stated:

> why he [Wisehart] leveled those accusations and the basis for those accusations, because we don't know what the basis of that is. To us, upon reviewing the record, we don't believe there is a basis for that.[41]

(Tr. of Oct. 29, 1998, at 36).

Wisehart's attitude toward this proceeding began to emerge minutes later when arbitrator Kleinman reprimanded Wisehart's lawyer Seham for interrupting, the transcript reading:

> ARBITRATOR KLEINMAN: [to Kellwood's attorney Wall] You may proceed.
>
> MR. SEHAM: What did you say?
>
> MR. WISEHART: He said you are a joke.

obviously disturbed—one even senses outraged—at Wisehart's unexpected letter to the AAA toward the close of the case, which is here specifically quoted:

9. The neutral referee [Liebowitz, identified by name at the end of the letter] further stated that if counsel for Polin [Wisehart] states that he has not received a fair hearing, he will abandon the case and will decline to decide the dispute to be arbitrated.

\* \* \*

11. The neutral arbitrator's off-the-record threat [alleged to have occurred on August 7, 1998,] to decline to decided the case unless plaintiff waives his fair hearing and due process rights is violative of the National Rules, the Due Process Protocol, and also the Federal Arbitration Act, 9 U.S.C. §§ 10, 11

\* \* \*

13. Such a threat, particularly when made off the record, is a perversion of the arbitration process and the National Rules.

\* \* \*

15. The problem is aggravated by the fact that contrary to paragraph 38 of the National Rules for the Resolution of Employment Disputes, entitled "Neutral Arbitrator's Compensation," the defendants have been making payments directly to the neutral arbitrator, by-passing the American Arbitration Association, [These payments,

MR. SEHAM: I'm a joke?

ARBITRATOR KLEINMAN: Can we stop the colloquy?

MR. WISEHART: That's what he said.

ARBITRATOR KLEINMAN: Stop the colloquy between individuals here. Mr. Wall will you conclude?

(*Id.* at 55–56). And finally the transcript reads:

> ARBITRATOR KLEINMAN: I would like to ask Mr. Wisehart on the record whether he is intending to decline to respond to the questions of the Panel based upon your earlier representation.
>
> MR. WISEHART: I concur with what my counsel said. I do decline. I do decline. On constitutional grounds as well as jurisdictional grounds.

(*Id.* at 62). Thus the record before the arbitrators contains no basis whatever for Wisehart's highly defamatory statements about arbitrator Liebowitz to the AAA,

Wisehart knew, were *never* to go through the AAA.] a procedure that is objectionable.

\* \* \*

22. However, it is clear that the defendants would withhold any further payments to the neutral arbitrator as a means of coercing him into desisting from granting such additional time necessary to complete the arbitration.

(Letter from Wisehart to the AAA of Oct. 23, 1998).

40. Wisehart's attorney Seham had requested up to several weeks to prepare. To this, the arbitrators responded:

ARBITRATOR KLEINMAN: This isn't a matter of the need for discovery. This isn't a matter of having to review the entire record. Mr. Wisehart knowingly wrote what he wrote. He'll have an opportunity to confer with you [Seham], that's why we agreed to put it off until tomorrow and tell you what it is he meant by these things so that he can then explain that to us. That's all there is to it.

CHAIRMAN LIEBOWITZ: And what is the basis of it.

(Tr. of Oct. 28, 1998, at 16–17).

41. Kleinman's entire statement to Wisehart and Seham is set forth *supra* pages 246–47.

accordingly leaving the reasonable conclusion that 1) there was no basis for them and 2) the purpose of the attack, as Kellwood's attorney Wall on the record conjectured,[42] was to destroy this arbitration which Wisehart saw going against his client, presumably forcing a settlement or a rearbitration. Having Liebowitz off the panel was certainly in Wisehart's mind when he wrote at the end of his AAA letter "if there is a vacancy." *See supra* page 246.

Lest it be conjectured that the above conduct of Wisehart is being unreasonably assessed by this Court in an isolated context, the words of Justice Karla Moskowitz, the New York State trial judge initially assigned to *Lipin* case, supra, come to mind with resonant redolent relevance. I quote from pages 331–34 of the Joint Appendix before the Second Circuit in *Lipin v. American Nat'l Red Cross*, Nos. 96–7195, 96–7193, 1997 WL 279912, at *5 n. 1 (2nd Cir. May 22, 1997), which that Court quoted in footnote 1:

> The exchange leading to Justice Moskowitz's recusal went as follows:
>
> * * *
>
> The Court [Justice Moskowitz]: ... The material that Mr. Wisehart has provided on the recusal subject is so scurrilous and so baseless and so ridiculous that I cannot even begin to be fair to any parties in this case after reading this. I am so concerned about this that if it were under his affirmation instead of his client's affidavit, I would feel compelled to turn this over to the grievance committee. Because for an attorney to stand up in court and address the Court the way Mr. Wisehart did last time, and

to supply the court with such ridiculous[,] ... such off-the wall allegations about a sitting judge is so egregious that I really can't even see and I can't even look at this case anymore and dispense justice. Now, that means Mr. Wisehart has accomplished exactly what he set out to accomplish, which is to obtain my recusal from this case. But I am not doing it for reasons that his clients set forth in an affirmation, because I don't even understand them ...

> * * *
>
> I don't have to stand up in a courtroom and be addressed by an attorney, who is supposedly an officer of the court, in a manner that Mr. Wisehart addressed me last week and the manner he addressed me this week. And I will not listen this week. I recuse myself. That's it.

Since the case was originally filed in this Court, any remedy available under Rule 11 of the Federal Rules of Civil Procedure was available to the arbitrators, and AAA rule 32(d), providing that an "arbitrator shall have the authority to provide for the reimbursement of representative's fees, in whole or in part, as part of the remedy, in accordance with the applicable law," was also available to the arbitrators. In addition, Polin's complaint in this Court starting this action, though voluntarily transferred to arbitration, alleges in paragraphs 58 and 62 age discrimination claims under the New York City Human Rights Law (N.Y.CHRL), New York City Administrative Code § 8–502 which allows attorneys' fees to be awarded to the *prevailing* par-

---

**42.** The transcript reads:

MR. WALL: ... With respect to the substance of why we're here, Kellwood strongly believes that the letter which was filed last Saturday with the American Arbitration Association—I misspoke—which was delivered by hand last Friday to the American Arbitration Association, but not served on either Kellwood or any of the arbitration members until Saturday, October 24, is nothing more than an attempt by Mr. Wisehart to antagonize and intimidate the Arbitration panel and particularly Mr. Liebowitz, in the hope that Mr. Liebowitz would recuse himself and resign from the Panel, thus upsetting the entire proceeding and requiring Kellwood to engage in the outrageous expense and time expenditure that it has already been forced to engage in by reason of Mr. Wisehart's delay tactics. (Tr. of Oct. 29, 1998, at 46–47).

ty.[43] The panel interpreted this provision, too, as authorizing them to reimburse Kellwood for its attorney's fees and costs. As arbitrators have the authority to fairly interpret an arbitration agreement, the panel had authority here.

Moreover, the basis for Kellwood's request for attorneys' fees and the imposition of sanctions arose after the arbitration agreement was signed. It was only after the claims were dismissed that the claim for attorneys' fees arose under the NYCHRL and under rule 32(d). To read the agreement as permitting only a remedy or award to Polin is contrary to the very purposes of arbitration, namely, efficiency and speed. If it were otherwise, the initiating party could delay or dissemble, and the injured adversary would have initiate another proceeding to recover for its injury. *Willoughby Roofing & Supply Co. v. Kajima Int'l.*, 598 F.Supp. 353, 357–58 (N.D.Ala.1984), *aff'd*, 776 F.2d 269 (11th Cir.1985), supports the panel's construction of the broad language here.

Equally meritless is Polin's contention that the panel exceeded its authority by awarding Kellwood half its expenses allegedly contrary to the language of the arbitration agreement which provided that Kellwood would pay for its own arbitrator, the neutral arbitrator, and the arbitration proceeding expenses. Though the arbitration agreement does so read, it also reads that the arbitrators may direct otherwise. *See supra* pp. 241–43. This, and the arbitrators' broad remedial powers under rules 32(c) and 32(d) gave them the power to treat the remedy they awarded as a sanction even though flowing from authorizing language contained in the arbitration agreement.

Polin next asserts the arbitrators acted in manifest disregard of the law. "In addition to the statutory grounds, a district court may vacate arbitration awards when the arbitrators acted in manifest disregard of the law," *Willemijn*, 103 F.3d at 12, or the evidence, *Halligan*, 148 F.3d at 202. The only asserted support of this that needs even mention is that the panel found that Polin's supposed replacement, Polivka, was forty years old and within the same protected age group and that individuals other than Polin had been terminated or retired from Kellwood after their divisions lost money. As stated earlier, the panel summarized its evidentiary finding the following way:

> Aside from Polin's belief that Sherri Polivka of Kellwood is 'youthful looking,' Polin should have remained at Kellwood, and that he rather than Polivka should have headed up a continued She Knows!! operation, a claim which conflicts with the evidence of Polin's own part in bringing about the demise of She Knows!! ... there is simply no ground for a claim of age discrimination.

(Arbitrators' Opinion of Apr. 10, 1999, at 26). It cannot be said that the panel under any standard manifestly disregarded the law or the evidence in this case.

Wisehart argues that the awards against him should be vacated because they violate New York's public policy against an arbitration award imposing punitive damages. *Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 353 N.E.2d 793, 386 N.Y.S.2d 831 (1976); *Fahnestock & Co., Inc. v. Waltman*, 935 F.2d 512, 519 (2d Cir.), *cert. denied*, 502 U.S. 942, 112 S.Ct. 380, 116 L.Ed.2d 331 (1991). However, to the extent the sanction award here might be viewed as punitive rather than compensatory to Kellwood for various damages, i.e., multiplication of costs to Kellwood by reason of Polin's tactics, etc., I do not view this public policy applying here where the

---

**43.** I note that now *before me*, Wisehart, at page 21 of his Memorandum dated September 23, 1999 asserts that the panel did not have jurisdiction to award sanctions against him because "as [Kellwood's counsel] is presumably aware the ADEA does not provide for attorney's fees ... to a prevailing employer." But Wisehart had not sued under the ADEA, but under the New York City Human Rights Law, which does permit such an award to a prevailing employer.

parties' arbitration agreement gave the arbitrators broad power to award "any remedy or relief that the arbitrator deems just and equitable, including any remedy or relief that would have been available to the parties had the matter been heard in court." (National Rules for the Resolution of Employment Disputes Rule 32(c) (American Arbitration Association 1997)); *see Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 59, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). Accordingly, this argument is rejected.

Polin also argues that public policy concerns raised in *Stroehmann Bakeries, Inc. v. Local 776, International Brotherhood of Teamsters*, 969 F.2d 1436 (3d Cir.), *cert. denied*, 506 U.S. 1022, 113 S.Ct. 660, 121 L.Ed.2d 585 (1992), require vacating this award. In *Stroehmann*, the court concluded that "an award which fully reinstates an employee accused of sexual harassment *without a determination that the harassment did not occur* violates public policy", *id.* at 1442 (emphasis added), because "it undermines the employer's ability to fulfill its obligation to prevent and sanction harassment in the workplace." *Id.* Unlike *Stroehmann*, however, where the arbitrator refused to address the alleged sexual harassment, the arbitrators here directly addressed the age discrimination claim and found it frivolous. Polin's arguments thus are the same as his statutory arguments under 9 U.S.C. § 10 but now dressed in public policy argument clothes. Having earlier found these arguments without merit, I similarly conclude that *Stroehmann* is not applicable.

Thus, viewing everything factual and legal recited in pages 11 through 43 of this opinion, I find there is more than enough support in the record for the panel's factual, legal, and jurisdictional conclusions as to the sanctioning of Wisehart for misconduct, starting with its finding, at *supra* pages 248–50, that Wisehart had made "false representations" as to what Celona would testify and going on to five further enumerated findings as to Wisehart, at

*supra* page ——, with the amount of the sanction being its reasoned view of the injury to Kellwood by Wisehart's said misconduct. Kellwood's motion to confirm these findings and conclusions is granted.

In sum, Polin's motions to vacate are denied and Kellwood's motion to confirm the panel's various awards on the merits and the sanction awards against Wisehart is granted in all respects.

The foregoing is so ordered. A formal order may be submitted by either party on notice.